IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| PALMAS DEL MAR HOMEOWNERS ASSOCIATION, INC.<br><br>Plaintiff<br><br>vs<br><br>MANNY FOX and his wife CINDA FOX and the conjugal partnership comprised between them<br><br>Defendants/Counterclaim Plaintiffs/Third-Party Plaintiffs<br><br>vs<br><br>ANTONIO MALDONADO and his wife JANE DOE and the conjugal partnership comprised between them<br>PALMAS DEL MAR PROPERTIES, INC.<br>and PALMAS DEL MAR UTILITIES CORP.<br><br>Third-Party Defendants | CIVIL 06-1636CCC |

## OPINION AND REMAND ORDER

The action before us was originally filed by plaintiff Palmas del Mar Homeowners Association, Inc., against Palmas del Mar (Palmas) property owners and association members Manny and Cinda Fox and their conjugal partnership. The object of the suit was an allegedly public easement between two lots owned by defendants that has been enclosed within a concrete wall surrounding their properties.

On June 27, 2006, the Foxes removed the case to this court on the basis of diversity jurisdiction, averring that they are and have always been domiciled in New York. Plaintiff filed a Motion to Remand (docket entry 6), which, with defendants' opposition, was referred to a U.S. Magistrate-Judge for an evidentiary hearing and report and recommendation (docket entry 20).

Two days of hearings were held on March 13 and 14, 2007 (see docket entries 50 & 51) after which the parties filed post-hearing memoranda (docket entries 54 & 56). The U.S.

CIVIL 06-1636CCC                                      2

Magistrate-Judge filed a Report and Recommendation (docket entry 58), in which he
concluded that the defendants were, indeed, New Yorkers and recommended denial of the
motion to remand.  Plaintiff and a third-party defendant filed objections to that determination
(docket entries 59 & 60).  Having reviewed all the testimonial and documentary evidence on
record, the Report and Recommendation, and the parties' briefs, we find that the Magistrate-
Judge erred in his conclusion and, as we resolve that the Foxes were domiciled in Puerto
Rico at the time of the filing of this action in local court, we now REMAND it for lack of
diversity jurisdiction.

        We start with bedrock law.  For purposes of diversity jurisdiction, a person is a citizen
of the state in which he is domiciled.  <u>Padilla-Mangual v. Pavía Hospital</u>, ___ F.3d ___, 1st
Cir. 2008).  A person's domicile is the place where he has his true, fixed home and principal
establishment, and to which, whenever he is absent, he has the intention of returning.  <u>Id.</u>;
<u>Valentín v. Hospital Bella Vista,</u> 254 F.3d. 353, 366 (1st Cir 2001).  In discussing the acquiring
of a domicile as it pertains to diversity, Judge Clemente Ruiz-Nazario drew from the
restatement of conflict of laws:

                To acquire a domicile of choice, a person must establish a
                dwelling place with the intention of making it his home.  The fact
                of physical presence at a dwelling place and the intention to
                make it a home must concur; if they do so, even for a moment,
                the change of domicile takes place.

<u>Godinez v. Jones</u>, 179 F. Supp. 135, 137 (D. Puerto Rico 1959).

        One way in which a person acquires a domicile is that, "having no home, he acquires
a home in a place other than his former domicile."  <u>Id.</u>

        Once challenged, the party invoking diversity jurisdiction must prove domicile by a
preponderance of the evidence.  <u>García Pérez  v. Santaella</u>, 364 F.3d. 348, 350 (1st Cir.
2004); <u>Bank One, Texas, N.A. v. Montle</u>, 964 F.2d 48, 50(1st Cir. 1992).  The key point of
inquiry is whether diversity of citizenship existed at the time the suit was filed; subsequent
events remain but are not part of the primary calculus.  <u>García Pérez</u>, supra, at 350-51.  The

factors ordinarily relevant to the determination of domicile are:  current residence; voter registration and voting practices; location of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs and other associations; place of employment or business; driver's license and other automobile registration; and payment of taxes.  García Pérez, supra, at 351.

With these principles in mind, we turn to the factual and legal analysis.

New York or Puerto Rico?

(A) Property Ownership

The evidence in the record and testimony and additional evidence submitted at the hearings provide the following history of the Foxes' relationship with Puerto Rico.  Mr. Fox first came to Puerto Rico in the early 1990's for some business meetings. Tx1-12.[1]  when the couple decided to buy property and build a house in Puerto Rico.  In 1996, they made a substantial investment in real estate, purchasing seven properties located within the Palmas del Mar residential complex in Humacao, Puerto Rico. They believed that Puerto Rico, and particularly Palmas, would be a profitable real estate  investment .  Mr. Fox pointed out that technically the properties were purchased in his wife's name because they used mostly her money to buy it, but they regarded it as belonging to both of them. Initially the family lived in a rented home in the Palmas Surfside area from 1996 to 1999. Tx1-69.  During that period they built their home on their lot at Shell Castle 31, Palmas, which was completed in 2000. This was their  home from 2000 until after the removal of this case in June, 2006.

Previously to moving their base of operations to Puerto Rico in the 1990's, Mr. Fox had lived in two apartments on Manhattan's upper East side, after which he moved in with his wife who was living in a loft in Greenwich Village.  Tr.1-11.  They sold that property that in 2000 to finance part of the construction of their home  in Palmas.   Since that time they

---

[1]The form Tr.1-x will be used to identify references to pages in the March 13, 2007 hearing transcript; Tr.2 refers to the March 14, 2007 transcript.

CIVIL 06-1636CCC                                  4

have not owned any real estate property outside Puerto Rico.  Tr. 1-67.  Mr. Fox testified that

for the past three years, which would be since about 2004, they have sublet a New York City

apartment at 246 West 73rd Street  from his son, to use as an office and in which to stay

when they are in New York. Tr.1-65-66.

        In sum,  since the year 2000, defendants have owned no property in New York and

yet have owned  seven properties in Puerto Rico, including their home.


(B) Business Interests

        With regard to defendants' business interests, Mr. Fox testified that he travels to a lot

of cities, mostly back to New York and Hollywood, but to other cities as well, and for a period

of seven months in 2004 they were in England with one show. Tr.1-22.  Inasmuch as one

purpose in coming to Puerto Rico was to create shows and movies, Tr.1-13, to that end

defendants organized two corporations under the laws of Puerto Rico:  Isla Children Musical

Theater, for which the address is listed as 17 Palmas del Mar Surfside, Humacao, Puerto

Rico and Shell Castle Film Corp., at 37 Shell Castle, Palmas de Mar, , Humacao, Puerto

Rico .  Mrs. Fox identified the first of their corporations as a non-profit corporation.  Tr.2-65.

The second is a privately held corporation owned entirely by her and her husband.  Tr.2-68-

67.  During the period prior to the filing of this suit, the Foxes identified various projects on

which they were working, two of which came to fruition:  a production in London, where they

spent seven months, of their play "Murderous Instincts," which closed after three weeks in

2004. Tr.1-84.  The second was a work called "Questionable Quest," written by Mrs. Fox,

with music by son William, that was performed by thirty-eight Palmas Academy students at

CIVIL 06-1636CCC                                5

Palmas, the Inter-American University in San Juan, and in New York as fund raisers for repair of the damage to their son's school in Palmas at Humacao, Puerto Rico from Hurricane Georges.[2]

(C) Licenses and Registrations

Mr. Fox testified that he has always had a New York driver's license. He applied for the Puerto Rico license after he was told that he had to get one if he was here more than 120 days. Although he was required to surrender that license when he obtained his Puerto Rico license, he stated that he did no do so.[3] Tr.1-59-60. He acknowledged that he does not personally own cars in New York, Puerto Rico or California, but does use two Ford Explorers owned by their family corporations in Puerto Rico. Tr.1-60-61.[4] Mrs. Fox does not drive and does not have a driver's license anywhere. Plaintiffs brought Mr. Carlos Bonilla-Rosado of the Directory of Services to Drivers of the Department of Transportation and Public Works to testify about Mr. Fox's Puerto Rico driver's license. Mr. Bonilla, however, was not very knowledgeable, his testimony was confusing, and added no relevant information.

Neither defendant has ever registered to vote in Puerto Rico. Mr. Fox testified that he has been a registered voter in New York City since the age of 18. Tr.1-15. He then

---

[2]The defendants stated that they are working on projects to have the play made into an animated film.

[3]The Commonwealth of Puerto Rico, Department of Transportation and Public Works, Application for Driver License, as posted on its website, requires that for a "Driver License for Persons Holding an Out of Puerto Rico License . . . [the person must] surrender driver license from previous State or Foreign country." It would appear that Mr. Fox surrendered his license that expired on the date he received his Puerto Rico license, December 6, 2002 and proceeded to renew his New York license.

[4]The parties wasted a lot of time bantering over the contention that the Foxes had seven vehicles registered with the homeowners association. It appears that registration for vehicles for employees such as their business secretary, who require access to the premises on a regular basis, might explain the additional permits.

CIVIL 06-1636CCC                                6

testified that he registered to vote in approximately 1968, after Robert Kennedy was assassinated.  Tr.1-16.[5]  Mrs. Fox stated that the last time she voted in New York was for President Clinton.  Tr.2-56.  She also clarified that one does not have to renew the voter registration in New York, as you remain permanently registered.  Id.  Therefore, the blank juror qualification questionnaire, defendants' Exhibit B, sent to Mr. Fox on a date unknown, at the New York office address used for the three years preceding the hearing, has no probative value regarding their current status as New York voters.

(D) Financial Matters

Mr. Fox testified that his wife maintained a small checking account in Banco Popular in Puerto Rico, for the purpose of paying local bills. Tr.1-16.  Comparing the amounts that they had here with what they had stateside, he stated that the average Banco Popular, Puerto Rico  balance was $10,000.00 and while the combined stateside accounts at JP Morgan and Bank of America are in excess of $10,000,000.00.  Tr.1-17.  As described by Mrs. Fox, however, these last two  "accounts" are actually part of an inheritance totaling approximately $13,000,000, set up with "a whole bunch of different trust[s] in each one, all with different rules and regulations."  Tr.2-57, line 3-19.  While she has a credit card related to the trusts, she does not have a checking account for them.  Nor does she have a checking account in California, she just uses her credit card there.  Tr.2-58.  Mr. Antonio Maldonado of the Palmas Homeowners' Association testified that Mrs. Fox pays her association dues and fees from a Banco Popular account which has the 31 Shell Castle address in Humacao, Puerto Rico, which is the only address that the Foxes have listed with the association.  Tr.2-78.

---

[5]Mr. Fox listed his date of birth on his Puerto Rico driver's license as December 6, 1934, plaintiff's Exhibit 3, thus making him 34 years old in 1968.

With regard to their tax returns, the 2005 Puerto Rico and federal tax returns, filed two months before this suit was filed, identified their 31 Shell Castle address in Palmas, Humacao, Puerto Rico  as both their home and postal address.  The 2006 federal income tax return (defendants' Exhibit H) filed with the Internal Revenue Service on  March 1 ,2007, is irrelevant to the domicile analysis. This return, which lists  the home address as West Hollywood, California, was filed three and one half months after the Foxes had been notified by the Court on November 13, 2006 of the remand hearing. At the March 14, 2007 remand hearing, Mrs Fox testified that they had been residing in California for about 6 months,[6] Tr.2-49, which would put their residential relocation there at about October, 2006, that is, four months after this action was removed to federal court.

On their Puerto Rico tax return, Mr. and Mrs Fox identified themselves as a film producer and writer, respectively.  On all of the returns, however, the only reported income is derived from interest and dividends,[7] primarily from Mrs. Fox's trust funds, Tr.1-80,  which Mr. Fox had identified as the money they had in stateside accounts.  None of the forms reflect any income from show business.  Inasmuch as none of the tax returns reflect payment of any income tax anywhere, the tax returns are, in and of themselves, of little probative value.

In an effort to undo Mr. Fox's statement in his March 9, 2006 letter that they were full time residents of Palmas, Puerto Rico, docket entry 6, Exhibit 3, Mr. Fox testified that he was

---

[6]Mrs. Fox testified that the address of the house in which they are staying in California is the same address listed as their office of many years.  The property is owned by her son. They "share" it with him and are not renting it.  Tr.2-55.

[7]When asked about income from his show business efforts, vis a vis the tax returns for 2005 and 2006, Mr. Fox's replies were non responsive and evasive:  i.e., "Well, income in show business is defined differently than any other income."  There was some reference to it, "I don't remember the exact characterization, you'll read it."  "As I said, there was a reference to it in the return, you"ll have to see it."   "The answer is that for all the time we've been here it's been development expenses.  How much income there was, was minimal.  . . . [W]e spent many millions developing, now we get the zillions from what we developed."  Tr.1-90-92.

CIVIL 06-1636CCC                                     8

unaware of the legal distinction between residence, domicile, and citizenship. Tr.1-47. The focus, however, is not only that the Foxes lived in Puerto Rico, but, as Mr. Fox wrote, they lived here "full time."  Moreover, the Informative Return for Special Partnership, part of defendants' 2005 Puerto Rico tax return, identifies Cinda Fox as a partner and states that she is a <u>resident</u>.  If, in fact, 31 Shell Castle was a "second" home, as defendants would have the court believe, and New York City was their primary residence, copies of New York state or city income tax returns,[8] which were not offered as evidence, might have provided evidence in meeting their burden of proof of a New York domicile.[9]

(E) William Fox's Education

        With regard to defendants' son William's education, it is undisputed that he was enrolled in the Palmas Academy at Humacao, Puerto Rico since  fourth grade in 1996 and graduated with his class in May 2005.  Mrs. Fox testified that he had been a full-time student there since he was about nine years old.  Tr.2-62.  With the exception of his senior year when he was living "with his parents in London and studied the curriculum of the Palmas

---------------

        [8]The New York City website, <u>www.nyc.gov</u> states, with regard to who must pay personal income tax:

>        Every income-earning individual who resides in New York City . . .
>        must pay personal income tax.  Part-year City residents calculate
>        their tax based on income and deductions for the resident period
>        only, and then prorate certain items...."

        [9] When the Court ordered defendants to produce specific evidence for the hearing, <u>see</u> docket entry 20, it did not identify which state's return was to be submitted.  The choice of which returns would best support their position was left to the defendants.  Contrary to the contention of the Magistrate Judge and defendants' attorney, <u>see</u> Tr.2-19-20, the 2005 returns were considered as being most relevant as they were filed shortly before this suit was begun in the Commonwealth Court and could be more relevant to the issue of domicile than where were they living at the end of 2006.

Academy with Tutors International of London,"[10] there is no evidence that any of the regular, academic school terms were spent at any other institution in New York or elsewhere.  To the contrary, in the letter presented by plaintiffs, their Exhibit 4, the head of the school certified that William Fox had attended Palmas Academy from August 1996 through August 2004 and went on to explain about the tutoring in London,[11] anchored on the Palmas Academy

_____

[10] Defendants' Exhibit A, letter of Dr. Lilliam Morales, Head of Palmas Academy.

[11] At this point the court would like to comment on Mr. Fox's demeanor as a witness at the hearings.  A review of the transcripts reveals him to be evasive and uncooperative in responding to any question the answer for which supported domicile in Puerto Rico. When asked about where William attended school, the following dialogue ensued:

Q: Where did your son go to school between 1996 and the time you lived at 31 Shell Castle?

A: He went to school at the place where we were working.

Q: which was...

A: In Palmas del Mar, to the Palmas Academy.

Q. Because you spent most of your time here in Puerto Rico at that time.

A: I wouldn't say most, but I would say he loved the school, we offered him to stay in New York to go to a great church school, we could have done that, he attended a couple of classes and he said, "Wow, I love this place! I want to be here."

Q: So the answer is yes, he was at Palmas del Mar Academy, correct?

A: He attended school here.

Q; Yes or no, he attended school here.  It's a simple question, yes or no, was he here in Palmas del Mar Academy as a full time student between 1996 and 2000?

A: There were many trips, but he did attend the Palmas Academy.

Q: Mr. Fox, is it that hard a question?  Yes or no, was he a student, full time student, at Palmas Academy, between 1996 and 2000.

CIVIL 06-1636CCC                                   10

curriculum, that culminated in his graduating from Palmas Academy at the end of his senior

year, after nine years of education in Puerto Rico.

(F) Selling the Puerto Rico Properties

There is a leap in the Magistrate-Judge's analysis to the moment when the Foxes'

properties were put up for sale, ignoring the family and professional events that occurred

from 1996 through 2005 that are relevant to the domicile issue.  In any event, the brokers'

---

A: Well, yeah ... Cinda handles the school stuff, not me.

Q: Was he in fact a full time student at Palmas del Mar Academy
from 1996 'til his graduation in 2005?

A. Except for his  .  .  . I can't say yes or no because I don't
understand the question.

Tr.1-70-72.

Mr. Fox fell into similar patterns of obfuscation when asked to identify photos of his house
:
Strangely enough so far . . . Oh there, I see.  It didn't look familiar,
one of them didn't.  I'm trying to figure out which is which, I've never
quite looked at them at this angle.  So far it looks like its probably it,
but it's an angle that I've never seen or have been aware of, I'm just
kind of orienting myself to recognize it.

Tr.2-11

and the fact that his cell phones had Puerto Rico phone numbers, See, Tr.1-62-65.  Mr. Fox
identifies himself as a "film producer" on his Puerto Rico income tax form; his wife repeatedly
deferred to him for information regarding financial matters, stating that he was the business man
and had a degree in economics.  See Tr.2-64.  Notwithstanding his alleged business acumen,
and his narration about all of the projects they are "developing," and all the financing backing they
are expecting, Mr. Fox stated, with regard to the identification of 31 Shell Castle as their home
address in the income tax forms, "I had an accountant who did it, and I was not sensitive to any
legal distinction, I saw forms and was told to sign them, has to sign US, and had to sign Puerto
Rico, and I suppose the Accountant, being Puerto Rican, who prepared it, made his own
judgment."  Tr.1-48.  This statement is, to say the least, suspicious, in light of the fact that the
same "mistake" was made when the West Hollywood address was listed on their 2006 tax returns
as their home address.

CIVIL 06-1636CCC                              11

agreements submitted in evidence do not support his conclusion that all the properties were
up for sale. The Magistrate-Judge described the Foxes as persons whose love affair with
Puerto Rico dwindled when Puerto Rico real estate values topped, as reflected in the
brokers' agreements, referring to defendants' Exhibit C.  He goes on to conclude that the
Foxes "decided to exit . . . and focus on other places of business activity before the filing of
this action or its removal to this Court."  Report and Recommendation, pp. 18-19.  There is
a finding that the animus revertendi remained in the Foxes' mind and that "if one considers
that the Palmas properties were all for sale either at the time of the filing of the complaint or
at the time of removal of this action from the Commonwealth court, even if the Foxes were
domiciled here, which they were not, there was obviously no animus manendi then."  Report
and Recommendation, p. 18.  The finding that the properties were all for sale at the time of
the filing of the complaint or at the time of removal is a misstatement of the evidence for the
following reasons:  (1) the October 15, 2004 and November 4, 2004 agreements with
Coldwell Bankers/Isla del Coquí (Exhibit 6) were for a period of 126 days and 18 weeks and
therefore were not in effect on June 1, 2006 when the complaint was filed in local court or
on June 28, 2006 when it was removed to federal court, (2) the February 25, 2005
agreement with CPM and Realtors, Inc. was for the sale of five of the lots, not all of the
properties, for a period of 360 days, having also expired before the relevant dates, (3) the
July 15, 2006 agreement between the Foxes and real estate broker Best Properties to sell
Shell Castle lots # 28, # 29 and #30 and Surfside lots #12 and #13, all at the Palmas
complex, was executed after both relevant dates, and (4) the last of the agreements with a
broker, executed by the Foxes and Alberto Hernández Real Estate, Inc., executed on March
2, 2007, and granting the latter a period of one year as of that same date to sell all of the
properties, including the Foxes' residence located at Shell Castle # 31.  This last broker's

CIVIL 06-1636CCC                                    12

agreement was executed over seven months after the motion to remand was filed on July 27, 2006 and eleven days before the first of the two evidentiary hearings on the motion to remand held on March 13 and 14, 2007.

There is another important aspect regarding the Foxes' agreements with real estate brokers that was overlooked by the Magistrate-Judge.  The broker's agreement closest to the date of the filing of the complaint and of the removal of this case is the July 15, 2006 contract with Best Properties.  See Exhibit C.  The first paragraph of such agreement reads: Best Properties (BP) agrees to represent Cinda and Manny Fox (CMF) as Real Estate Broker for the sale of five new homes to be built on CMF's lots:  Shell Castle #28, # 29, # 30, Surfside #12, #13...."  One of the terms of the sale of these five new homes to be built on the vacant lots was that "Shell Castle # 31 shall be used as a model for what the new houses shall be, including the pool."  This agreement is addressed to the Foxes at their address at 31 Shell Castle, Palmas de Mar, Humacao, Puerto Rico.  Contrary to what the Magistrate-Judge concluded at pages 18 and 19 of the Report and Recommendation that their love affair with Puerto Rico dwindled when the Puerto Rico real estate values topped, what the Best Properties agreement reflects is their decision to further invest in real estate in Humacao, Puerto Rico by building five new luxury houses on their vacant lots modeled on their $4,500,000.00 home at 31 Shell Castle home.  This development fits squarely with the real estate investment activity in which the Foxes  have engaged in since their arrival in Puerto Rico in 1996.  This evidence, instead of being indicative of an end to their real estate business venture in Puerto Rico, clearly reflects continuity of the same.

Totality of the Circumstances

As we stated above, once jurisdictional allegations are challenged, the party asserting diversity has the ultimate burden of establishing those allegations with competent proof. Beltrán v. Wesleyan Church Corp., 218 F. Supp. 2d 136, 139 (D. Puerto Rico 2002).  That determination shall be made considering the facts as they existed at the commencement of

the case.  <u>Toste Farm Corp. V. Hadbury, Inc.</u>, 70 F.3d. 640, 642 (1st Cir. 1995).  The defendants cannot rely on unsubstantiated allegations to satisfy this burden.  <u>Media Duplication Serv., Ltd. V. HDG, Software, Inc</u>., 928 F.2d 1228, 1235 (1st Cir. 1991).  Additionally, no presumption of truthfulness attaches to the jurisdictional allegations.  <u>Del Rosario-Ortega v. Star-Kist Caribe, Inc.</u>,130 F. Supp. 2d 277, 280 (D. Puerto Rico 2001). A party's self serving statements are subject to judicial skepticism when they are contradicted by other evidence.  <u>White v. All America Cable & Radio, Inc.</u>, 642 F. Supp. 2d 69, ___ (D. Puerto Rico 1986).

The totality of the circumstances analysis in this case establishesby a preponderance that in 1996, the Foxes rented a home in Palmas, Humacao, Puerto Rico  and enrolled their son in the Palmas Academy, where he studied continuously through 2004.  His senior academic year, 2004-05, he studied with a tutor in London, following the Palmas Academy curriculum so that he could graduate with his class there in May 2005.  After 1996 the Foxes purchased seven properties in Palmas, as part of their real estate in Humacao, Puerto Rico. From 1996 to 1999 they built their home at 31 Shell Castle, Humacao, Puerto Rico  where they moved in 2000.This home was approximately 8, 000 square feet and part of a complex that included tennis courts, a club house, and a three story building that the Foxes used as an office and guest house on two of their lots across the street from their home.  Defendants sold their last New York City residential property, the only remaining property they owned in New York, in 2000.

For the next several years, Mr. Fox maintained an office at 1501Broadway which he closed in 2004.  Thereafter, they sublet from their son the West 73rd Street apartment  for use as an office and a place to stay when they went to New York.

The Foxes organized two domestic corporations in Puerto Rico–Isla Childrens Musical Theater and Shell Castle Film Corp., both of which they wholly own and that list 31 Shell Castle, Humacao, Puerto Rico  as their business addresses.  Mr. Fox has a Puerto Rico

drivers' license and drives two cars in Puerto Rico belonging to his corporations, and, while he has maintained his New York drivers' license, he does not own any vehicles there. Although the Foxes have never registered to vote in Puerto Rico and have maintained their voter registration in New York because, as Mrs. Fox testified, New York voter registration never expires, the last time she voted there was for President Clinton who last ran for reelection in 1996,[12] precisely the year they moved to Palmas.  Defendants did not provide any evidence regarding Mr. Fox's New York voting record since 1996.

In April 2006, the defendants filed Puerto Rico and federal income tax returns for the year 2005.  The home address listed on the forms was their Palmas address.  Mrs Fox is identified as a Special Partner and a Puerto Rico resident on one of the forms.  Although the 2006 California and federal forms include a California address as their home address, Mrs. Fox testified in March 2007 that they had only been there about six months, that is, they moved there several months after the suit was filed.

The U.S. Magistrate-Judge bases his conclusion regarding the lack of a Puerto Rico domicile on the undisputed principle that residence alone does not establish one's domicile. Although residence is not equivalent to domicile, it is, nonetheless, highly relevant to the issue of domicile Lundquist v. Precision Valley Aviation, Inc., 946 F.2d 8, 11 (1st Cir.1991). The substantial evidence in support not only of their lengthy residence in Puerto Rico but also of their intention to remain here indefinitely was disregarded.  He downplayed the fact that the Foxes' son went to school in Puerto Rico from the fourth grade through the eleventh grade and graduated from that same school by taking tutoring classes abroad approved by the Palmas Academy. The son was reared and educated in Puerto Rico, a clear indicator of their intention to establish a dwelling place and to grow roots in Puerto Rico, as opposed to a transitory stay.

---

[12] She did not specify whether she last voted in 1992 or 1996.

CIVIL 06-1636CCC                              15

       We also note that there is no consideration in the Magistrate Judge's  domicile
analysis that the Foxes only home has been uninterruptedly in Puerto Rico for over a decade
since the year 1996 until the 2006 removal of this case, that they have not owned any
properties ouside Puerto Rico since the year 2000; that their major artistic business activities
and real estate dealings during the last decade were in Puerto Rico, not in New York;  that
the corporations through which they conducted business were registered in the
Commonwealth of Puerto Rico; that they filed income tax returns in Puerto Rico, not in New
York; that their only checking account during the past years has been kept in a banking
institution in Puerto Rico, not in New York; that, although registered to vote in New York,
neither one of the defendants has exercised the right to vote there since relocating to Puerto
Rico in 1996; that the only cars owned by them or their wholly-owned business entities are
in Puerto Rico; that they owned no vehicles in the state of New York thereby rendering
irrelevant  Mr. Fox' holding a New York driver's license at any time after 1996; that the
property at 31 Shell Castle was more than just a residence since it also housed an office
complex where they conducted business meetings and rehearsals; that their only home was
constructed with monies obtained from the sale of the property in New York; that the most
recent real estate broker's agreement the Foxes executed reflects that they were going to
build five new houses at Palmas to be sold as part of their real estate business activities in
Puerto Rico in which they had been involved since 1996; that such activity was not  minor
but, rather, a multi-million dollar venture for the construction of five new luxurious house in
Palmas del Mar; that the income potential of  these substantial economic investments was
an important part of their business ventures in Puerto Rico; and, finally, that their child was
raised and educated in Palmas at Humacao, Puerto Rico and the family has been a part of
that community for a decade.

       In sum, all the indicators gleaned from the evidence on record point in only one
direction:  the Foxes have been physically present  in Puerto Rico since 1996 and had the

CIVIL 06-1636CCC                                16

intention to remain here indefinitely.  At the  time this action was filed in local court and removed to this Court in 2006 they were domiciled in Puerto Rico and had acquired no other. Accordingly, the Report and Recommendation of U.S. Magistrate-Judge Arenas is REJECTED as not supported by the evidence.

        For the reasons stated, plaintiff's Motion to Remand (docket entry 6) is GRANTED. This case shall be immediately remanded to the Court of First Instance of the Commonwealth of Puerto Rico, Superior Part of Humacao.

        SO ORDERED.

        At San Juan, Puerto Rico, on March 31, 2008.


                                        S/CARMEN CONSUELO CEREZO
                                        United States District Judge